## Hays Estate

*W. Brown Higbee, James R. Carroll* and *Thomas A. Waggoner*, for accountants.

*Wade K. Newell* and *E. D. Brown*, for Elizabeth Gemas, claimant.

MATTHEWS, P. J., September 7, 1950.—The first and final account of the surviving administrators of the estate of the above-named decedent is before us for audit, confirmation and decree of distribution. . . .

The principal matter requiring discussion is the claim of Elizabeth Gemas against this estate for the sum of $100,000. Decedent and claimant were first cousins, their mothers having been sisters. Neither decedent nor claimant ever married. Decedent died January 1, 1948, intestate, at the age of 73 years, having lived for over 40 years at the New Mason Hotel in Masontown, which hotel was owned and operated by him. In addition to the operation of the hotel decedent had various business interests for many years, including banking and the operation of coal mines. Claimant contends that in March or April of 1922 she entered into an oral agreement with decedent whereby she went to the New Mason Hotel to live and to perform certain personal services for him in consideration of which he agreed to give her $100,000 "out of his estate at his death". She lived at the hotel until decedent's death and contends that she performed such services as were required of her under the agreement but avers that decedent failed to make a will or otherwise provide the sum of $100,000 for her and, therefore, she now seeks to recover this amount from his estate.

All of the authorities are uniform in holding that claims of this nature against estates of decedents require the closest and most careful scrutiny to prevent injustice and can only be enforced when the proof is clear, precise and indubitable. Brief excerpts from a few of the many authorities may be helpful in understanding more clearly the standard of proof required.

In Graham v. Graham's Executors, 34 Pa. 475, 480 (1859), the court said:

"The temptation to set up claims against the estates of decedents, particularly such decedents as have left no lineal heirs, is very great. It cannot be doubted, that many such claims have been asserted, which would never have been known, had it been possible for the decedent to meet his alleged creditor in a court of justice. Not unfrequently, we witness a scramble for a dead man's effects, disreputable to those engaged in it, and shocking to the moral sense of the community. Such claims are always dangerous, and, when they rest upon parol evidence, they should be strictly scanned. Especially, when an attempt is made, under cover of a parol contract, to effect a distribution different from that which the law makes, or that which the decedent has directed by his will, should it meet with no favour in a court of law. Even if any such contract may be enforced, it can only be, when it is clearly proved, by direct and positive testimony, and when its terms are definite and certain. The danger attendant upon the assertion of such claims requires, as was said by Chief Justice Gibson, in reference to a somewhat similar contract, that 'a tight rein should be held over them, by making the quality, if not the sum, of the proof a subject of inspection and governance by the court, and by holding juries strictly to the rule prescribed'."

In Walls' Appeal, 111 Pa. 460, 471 (1886); the court said:

"Claims of this nature against dead men's estates, resting entirely in parol, based largely upon loose declarations, presented generally years after the services in question were rendered, and when the lips of the party principally interested are closed in death, require the closest and most careful scrutiny to prevent injustice being done. We cannot too often repeat the cautions we have so frequently uttered upon this subject, and we feel that the present occasion is one which demands both their repetition and their application."

In Calvert v. Eberly, Admr., 302 Pa. 152, 156 (1931), the court cites, inter alia, the Graham case and Walls' Appeal and says:

"A parol contract of a decedent to give the plaintiff a portion of his estate in consideration of services rendered, even if capable of being enforced, can only be enforced when clearly proved by direct evidence, and when its terms are definite and certain. Claims of this nature should receive the closest and most careful scrutiny."

In Mooney's Estate, 328 Pa. 273, 274 (1937), the language of the court is:

"We have said many times that claims of this nature must be subjected to the closest scrutiny, being objects of just suspicion . . . and must be established by evidence 'clear, precise and indubitable'."

Again, in Roberts Estate, 350 Pa. 467, 468 (1944), the court says:

"Claims against a decedent's estate for wages for personal services, where it is alleged that the same are to be paid for by testamentary provision, must be examined with great care."

In Cramer v. McKinney et al., Execs., 355 Pa. 202, 203 (1946), the court again said:

"Claims against a decedent's estate for breach of an oral contract to make a will are the subject of the closest scrutiny, being the objects of just suspicion, and

must be established by evidence clear, precise and indubitable"; and to bring this legal principle down to date, Mr. Justice Horace Stern in the late case of Stafford v. Reed, Admr., 363 Pa. 405, 409 (1950), repeats and approves what he terms "a few of the judicial admonitions that have been proclaimed concerning the standard of proof required to establish a claim of this nature against a decedent's estate."

An understanding of the legal significance and meaning of the terms "clear, precise and indubitable" might also be helpful.

"When such terms as 'clear, precise, explicit, unequivocal and indubitable' are used by the courts in defining the requisite proof of a particular fact to be made out by verbal testimony, it is meant that a conviction shall be fastened in the minds of jurors as strong as verbal testimony is able to convey. It is meant that witnesses shall be found to be credible—that the facts to which they testify are distinctly remembered—that details are narrated exactly and in due order—and that their statements are true": Spencer et al. v. Colt, 89 Pa. 314, 318; Baranski v. Wilmsen, 56 Pa. Superior Ct. 153, 161; Ralston et ux. v. Philadelphia Rapid Transit Company, 267 Pa. 257, 267; Leonard v. Coleman, 273 Pa. 62, 69; Miller's Estate, 279 Pa. 30, 38. In Lindemann v. Pittsburgh Railways Company, 251 Pa. 489, 492, indubitable proof is defined as "evidence that is not only found to be credible, but of such weight and directness as to make out the facts alleged beyond a reasonable doubt". See also Vogel, Administrator, v. Taub, 316 Pa. 41, 43. In Broida v. Travelers Insurance Company, 316 Pa. 444, 448, the court in discussing the terms "clear, precise and indubitable" said:

"The phrase has a technical legal meaning. That meaning is that the witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated

exactly and in due order, and that their testimony is so clear, direct, weighty and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." Most of these cases and others are cited and quoted with approval in Stafford v. Reed, Admr., 363 Pa. 405, 410.

We now come to a consideration of the testimony and the application thereto of the above-stated legal principles. Claimant produced 12 witnesses in support of her claim. Each of four of them testified that she was present on a specified occasion, the exact time not being fixed, when the matter of the alleged contract between decedent and claimant was mentioned or discussed and at which times both decedent and claimant were also present. Of these four witnesses two are claimant's sisters and two are friends and acquaintances. It is contended that the contract was made "around" the middle of March or April 1, 1922, at Shadyside Farm in Georges Township, this county, in the presence of claimant's sister, Nell Gemas Nelson. The testimony of Mrs. Nelson is that she was residing on this farm at the time with her husband and her sister, claimant; that decedent either owned or had an interest in the farm and that a coal mine was being operated thereon in connection with which her husband was employed. Claimant had been engaged in painting the inside woodwork of the farm house when decedent called at about one o'clock in the afternoon. On direct examination the testimony of Mrs. Nelson as to what occurred can best be related by copying the record as follows:

"A. Boyd came over. We were talking about the farm, what we were going to do about arranging the crops, etc., and Elizabeth was there with us and before Boyd left, he asked her how she was getting along with her work, and I said 'Just fine, come in and see it'. He came in and we went in the bedroom upstairs, I remember very distinctly, and he said: 'My, it looks nice, just

fine. I wish I had someone like this to do for me.' Elizabeth said: 'When this job is finished I have to look out for some kind of work or something.' He said, 'What do you think you will do, or what were you thinking of?' And she said, 'In training at the West Penn for nursing.'

"Q. That's what Elizabeth said?

"A. That's what Elizabeth said to him. Then he proposed 'Why not come and work for me?' He said that Bertha or somebody that was there for so long was leaving or had left, I don't know which, and 'I think that Elizabeth could come over. Then I would have somebody that I was sure of'. And so she agreed to go over and he said what he would expect from her, to look after getting his meals, keeping the place nice. And he said: 'You do that for me and you will never regret anything because when I die, I will give Lib $100,000 from my estate'. Those were his words."

Mrs. Nelson says that her sister went to Masontown in less than a week after the above conversation took place and that decedent told her shortly thereafter that he proposed giving her employment at the bank. On cross-examination Mrs. Nelson stated, in substance, that the conversation began on the back porch, that she asked decedent to go in the house and see the job of painting on the walls, that they went upstairs, when the conversation was finished, that the only person present except herself and decedent was her husband, Stanley Nelson, who is now deceased and that Elizabeth, claimant, was then at Masontown. On redirect examination an attempt was made to rectify the last-mentioned statements of the witness and at which time she stated that there were two conversations at different times, one about the farm and one about Elizabeth and that Elizabeth was present when the conversation as to her took place. On further cross-examination this witness at first stated that the conversation about

Elizabeth occurred about a week after the conversation about the farm and later stated that she believed they occurred on the same day. Returning again to direct examination, she says that Elizabeth inquired of decedent as to what kind of work he had to do and that he replied: "You have no home, nor I, and we could be very comfortable, if you would look after me and take care of the house." Mrs. Nelson continued to reside on the farm until 1925, during which time she visited her sister at the hotel in Masontown a few times. She then moved to Pittsburgh where she now resides.

Marie Gemas Hartigan, the other sister of claimant and the wife of Dr. J. W. Hartigan, states that she has resided in Morgantown, W. Va., for over 25 years and that she visited her sister at the hotel in Masontown on an average of about once a month. On the occasion of her first visit in 1922 she talked with decedent, in the presence of her sister, and her testimony as to what was said, copied from the record, is as follows:

"A. He said that he was so glad to have her, that she had been a great help to him in his work and in the home and that she would be well taken care of, for she would inherit from him at his death $100,000, that they had agreed upon that, that was the agreement."

This witness says that she had other frequent conversations with decedent and that on one occasion when she complained of the hard work her sister was doing, decedent stated that she would be well paid for it at his death. It does not appear that claimant was present at any of the conversations except the first.

Mrs. Mary Mason Potts and Mrs. Alice Chaplan Tesh, both of whom reside in Uniontown state that they are friends of claimant, the first having known her for about 25 years and the latter for about 15 years. They paid social visits to claimant at the hotel in

Masontown and on one occasion when they stated that Elizabeth did not look so well, the testimony of Mrs. Potts is that decedent said that he and Elizabeth had an understanding. She states that decedent said: "Elizabeth and I understand each other. We have an agreement where at my death Elizabeth will receive $100,000, or one tenth of a million." Mrs. Tesh's version of what decedent said is as follows: "I know that Elizabeth works hard but she will be compensated for that, that he and Elizabeth had an agreement that she would be very well taken care of, that she would be amply cared for in the amount of $100,000." Mrs. Potts fixes the time of this conversation at a year or a year and a half before decedent's death and Mrs. Tesh thinks it occurred in August or September 1947.

It is unnecessary for us to discuss in detail the testimony of the other eight witnesses called by claimant. Four of them testified to certain declarations made by decedent to the effect that claimant "would be taken care of" or somewhat similar statements, but claimant was not present when any of these declarations were made, and, therefore, this testimony is incompetent. It has uniformly been held that declarations made to third parties where claimant does not participate are not evidence of a contract: Donohoe's Estate, 271 Pa. 554, 558; Reynolds, Executrix, v. Williams' Executor, 282 Pa. 148, 151; Roberts Estate, 350 Pa. 467, 472; Cramer v. McKinney et al., Executors, 355 Pa. 202, 204; Stichler Estate, 359 Pa. 262, 263. For the most part the testimony of these eight witnesses is with respect to the nature of the work done and services performed by claimant and concerning which there is a wide discrepancy between the witnesses produced by claimant and those produced by the administrators of the estate. It is asserted generally by the witnesses for claimant that she did all kinds of work about the hotel, including scrubbing, cleaning, preparing and serving meals for

decedent, nursing him during certain periods of sickness, filing some of his papers and looking after some of his business affairs. On the other hand, it is contended by witnesses produced by the administrators that maids employed for this purpose did the scrubbing and cleaning at the hotel, except however, the rooms occupied by claimant; that at first, both decedent and claimant took their meals in the dining room operated in connection with the hotel, and later operated by another party as a restaurant until 1936, and for which meals decedent paid; that during the few short periods of sickness decedent was cared for by professional nurses and others and that claimant did nothing with respect to the personal business affairs of decedent except, however, on a few occasions she may have attended to some matters during banking hours in the bank where she was employed and of which bank decedent was a director and an officer. After the restaurant was closed a private kitchen was installed on the second floor of the hotel and it is contended on the part of claimant that thereafter she prepared and served decedent's meals from that kitchen, while on the part of the administrators it is contended that he had breakfast there but that he took his other meals elsewhere. In general, the position of claimant, as revealed by her witnesses, is that her duties at the hotel were difficult and arduous, while the administrators contend that she could not have done so much for the reason that she was regularly employed elsewhere during the entire period. It is admitted that she was employed as a clerk or teller at the First National Bank of Masontown from 1922, or shortly after she went to the hotel to live, until the bank closed in 1931, and that she was similarly employed at the Second National Bank of Masontown from 1936 or 1937 until decedent's death. Between the dates mentioned she was employed in Uniontown and elsewhere. But, in our view of the matter, it is not

necessary for us to appraise the work done and the services performed by claimant for decedent. Her claim is not based on a quantum meruit.

It is upon the testimony of her two sisters and her two friends and acquaintances as herein above mentioned that claimant must rely and, in our opinion, their testimony falls far short of measuring up to the standard of proof required to sustain her claim. The foundation of the claim is laid upon the testimony of claimant's sister, Mrs. Nelson, but her testimony is so confusing and contradictory as to be entirely unreliable and entitled to no weight. It is apparent that the other three witnesses were called for the purpose of confirming the agreement alleged to have been made in the presence of Mrs. Nelson at Shadyside Farm. While the testimony of the other sister, Mrs. Hartigan, is not so confusing or contradictory, yet she fails to relate the details of the alleged agreement with such exactitude as to be convincing. For example, she states on cross-examination that decedent was to furnish claimant with food and room with bath, but does not indicate whether these provisions of the alleged agreement were mentioned and discussed between claimant and decedent in her presence. The sisters can scarcely be regarded as disinterested witnesses. The statement attributed to decedent in the presence of claimant and her two friends is not so clear and precise as to details as to constitute sufficient proof of the contract. It will be recalled that the testimony of these two witnesses is that when they complained to decedent that claimant did not look well and that she worked too hard, he stated that they had an agreement that she was to receive $100,000. The fact that the promise of even so large a sum could not restore claimant's health or make less arduous the work she had to do does not appear to have been mentioned by either of these witnesses. None of the witnesses is able to fix the

date of the conversation concerning which she testifies. The testimony is not clear, precise and indubitable, but on the contrary, obscure, loose and doubtful. All of these four witnesses are definite and precise about one thing only and that is that claimant was to have $100,000, no more, no less, but none attempts to define in detail the work to be done or the services to be performed by the claimant for such a fanciful and extravagant sum.

"The estates of the dead would be in great jeopardy if orphans' courts were bound to accept as verity all testimony given in support of claims made against them, especially when based on conversations occurring fifteen years before the testimony was given": Davies' Estate, 289 Pa. 579, 587.

"There may be such a degree of improbability in the statements themselves as to deprive them of credit, however positively made": Burke Executor v. Kennedy, 286 Pa. 344, 349; Matthews v. Derencin et al., 360 Pa. 349, 354.

Eliminating the improbability that a man of the business ability and experience that decedent was shown to have would make a contract involving any such sum unless all of its provisions were set forth in writing, it seems strange to us that the alleged agreement was not discussed by claimant and decedent in the presence of anyone from 1922 until about 1947, or a period of 25 years. From her experience in a responsible position in the bank claimant must have known the necessity of proof of any oral contract. It would seem only natural that she and her sisters, both of whom were older, would want to know how decedent proposed to provide the sum of $100,000 for her and whether he had made or intended to make a will. The record is entirely silent in this respect.

Decedent left a writing or memorandum dated July 15, 1944, in which he provided for the payment of cer-

tain sums to certain persons, including the sum of $5,000 to Elizabeth Gemas, claimant, and the payment of these sums was approved by the heirs of decedent. The sum of $1,000 on account of this memorandum was paid to Elizabeth Gemas by one of the administrators on November 23, 1948, and his testimony is that at that time she said something about a claim against the estate for services, but said nothing about an agreement for any such sum as has been mentioned in this proceeding. On August 9, 1949, claimant's counsel wrote a letter to W. Brown Higbee, of counsel for the administrators, in which he stated, inter alia, that the claim was for services rendered to R. Boyd Hays from July 1937 to the date of his death, but the letter does not state the amount of the claim. It is contended that these incidents negative the existence of any such agreement as was attempted to be proven. The letter was admissible as a piece of evidence to be considered along with all other evidence in the case. Clearly the author of the letter was acting within the scope of his authority, and therefore, the statements contained therein have the same force and effect as if made by claimant herself: Stockton et al. v. Demuth, 7 Watts 39; Truby v. Seybert, 12 Pa. 101; McGarity et al. v. New York Life Insurance Company, 359 Pa. 308, 314. The result of the admission of the letter is to show that claimant shifted the basis of her demand and, therefore, it is an item of evidence affecting the integrity of her claim: Lineaweaver's Estate, 284 Pa. 384, 391. The situation is analagous to an amended pleading. While the original pleading is then out of the case as such, it is nevertheless still available as evidence of any relative admissions or statements contained therein: Easton School District v. Continental Casualty Co., 304 Pa. 67, 72. We might say, however, that we do not rely upon this letter as a necessary item of evidence to tip

the scales against the claim. There is simply insufficient credible testimony to sustain it.

The claim is not for the value of services rendered. No attempt whatever was made to prove the value of the services, all evidence with respect thereto being as to the nature thereof. The claim is on an express contract for a fixed amount and having failed to prove the contract by the standard of evidence required in cases of this kind, claimant cannot recover on a quantum meruit: Witten v. Stout, Executor, 284 Pa. 410, 412; Cramer v. McKinney et al., Executors, 355 Pa. 202, 204; John Conti Co., Inc., v. Donovan, 358 Pa. 566, 572; Stafford v. Reed, Administrator, 363 Pa. 405, 409.

Before concluding this opinion we desire to say that it is cases of this kind that suggest the advisability of legislation requiring such contracts to be in writing. The danger of having large estates entirely swept away by the testimony of witnesses as to oral statements made many years before is very great. This has led some jurisdictions, including Massachusetts and California, to include contracts of this nature under the statute of frauds and to provide that contracts not to be performed within a year or within the lifetime of the promissor shall be in writing. An eminent authority has stated that "written evidence is more necessary in contracts of this sort, than in the classes of contracts covered by the ordinary provisions of the statute of frauds", and he suggests that such legislation should be adopted generally: 4 Page on Wills, p. 856. Such legislation would not prevent recovery of the fair value of services rendered and, therefore, would do no injustice to the person who relied on an oral promise. The effect of the statute of limitations would be avoided in those cases where it could be shown that the services were not to be paid for until after the death of the promissor. . . .

*Decree*

And now, September 7, 1950, the account in this estate having been examined and audited by the court, upon consideration thereof, it is ordered and decreed that said account, as corrected and amended be confirmed; that the claim of Elizabeth Gemas for $100,000 be and the same is hereby disallowed and that the balance of the assets be paid, assigned, transferred and set over in accordance with the schedule of distribution hereinafter set forth, unless exceptions are filed within 10 days.